**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| YESENIA MELENDEZ,<br><br>   *Plaintiff,*<br><br>v.<br><br>PENN INTERNAL MEDICINE,<br><br>   *Defendant.* | CIVIL ACTION<br>NO. 23-786 |

**PAPPERT, J.**                               **December 11, 2023**

<u>**MEMORANDUM**</u>

  Yesenia Melendez was born and raised in Puerto Rico and Spanish is her first language. In late 2020, Deborah Sinni, the Senior Practice Manager for Penn Medicine's J. Edwin Wood Clinic, interviewed Melendez for the position of Clinical Services Associate, a job which requires the employee to perform clinical and administrative duties as both a medical and patient services assistant. Communication skills are essential to the position, given the required interactions with patients and clinicians. And here, with many Spanish speaking patients, Melendez's Spanish language skills were a plus—Sinni was looking for someone who spoke Spanish, in addition to being able to speak, read and write in English. Sinni offered Melendez the position on December 31, 2020 and Melendez started work on January 25, 2021.

  Melendez did well at the clinic and her initial performance appraisal, assessing her work between January 25 and July 25, 2021, was excellent. In fact, her supervisor, Sinni, rated Melendez higher than Melendez graded herself. For example, Melendez felt her ability to communicate effectively "needed development" while Sinni said her

1

communicative abilities were "approaching skilled," a higher rating. Among other praise, Sinni described Melendez as "a STAR!!," saying she showed quality in her work, had a "strong interest and curiosity in everything she does," that she worked "knowledgeably and capably," and was someone who could "always be counted on to make good decisions." In sum, Sinni gave Melendez very complimentary feedback, expressing confidence and support for her future career in healthcare.

On September 13, however, Melendez sent Sinni her resignation, to be effective September 24. She thanked Sinni for all she and the position had taught her. Sinni met with Melendez in an effort to change her mind and keep her at Penn. Melendez said she bought a home in New Jersey and wished to work in the Garden State, though she would stay if Penn could pay her more money, something Sinni knew Penn could not do given Covid-19 pandemic related limitations. Sinni accepted her resignation on September 16. As it turns out, Melendez had been offered a job in New Jersey by Everside Health on September 10 with a proposed start date of September 27—dates which dovetail with the dates of Melendez's Penn resignation letter and proposed final day of work at the Wood Clinic.

In October 2022, Melendez filed this lawsuit in the Philadelphia County Court of Common Pleas. The Trustees of the University of Pennsylvania removed the case to federal court. Melendez now claims that during her time with Penn Medicine, Sinni subjected Melendez to a hostile work environment and discriminated and retaliated against her because of her Spanish accent. The Trustees moved for summary judgment. The Court heard oral argument on the motion, during which Melendez's counsel acknowledged that judgment should be entered against her on the retaliation

claim. After thoroughly reviewing the record, the parties' briefing and holding oral argument, the Court now grants the motion with respect to the discrimination and hostile work environment claims as well because Melendez cannot establish a *prima facie* case for either one.

I

From January to September of 2021, Yesenia Melendez was employed as a clinical services associate at Penn's J. Edwin Wood Clinic. (Def's SUMF ¶¶ 10, 31, ECF 18-2).[1] A clinical services associate is a patient facing role, and Senior Practice Manager Deborah Sinni, always looking for Spanish-speakers, viewed Melendez's language abilities as an asset and hired her. (*Id.* ¶¶ 9, 13); (Sinni Decl. ¶ 4, ECF 18-16).

Melendez needed to clearly communicate in English with patients, co-workers and physicians. The job description—which Melendez agreed was accurate—required "interpersonal/verbal communication skills" and the "ability to speak, read, and, write in English." (Clinical Services Associate Job Description, at 3, ECF 18-11);[2] (Melendez Dep. 73:6–19, ECF 18-6); (Def's SUMF ¶ 10). From the beginning, the clinic received complaints about Melendez's ability to communicate verbally and through email, so other employees handled Melendez's phone calls, while Sinni coached her to speak slowly and clearly, and reviewed her emails before they went out. (Sinni Decl. ¶¶ 6–8);

---

[1] Melendez incorporated by reference Penn's Statement of Material Facts and all supporting exhibits. (Pl. Resp. to Mot. Summ. J., at 3, ECF 19). Rather than contesting any facts, she merely added a few of her own. *Id.*

[2] All page numbers are referring to the ECF page number.

(Def's SUMF ¶¶ 47, 49); (Melendez Dep. 90:1–25).  Over time, Sinni said Melendez's communication skills improved dramatically.  (Sinni Decl. ¶¶ 8, 10).

Melendez thought she was being singled out, micromanaged and discriminated against and says she was "going home crying every day."  (Melendez Dep. 17:14–17, 84:16–18).  She was especially upset when Sinni critiqued her pronunciation of "vitals" while she spoke with a patient; other times, Sinni allegedly said Melendez was "not professional enough because of the way [she] speak[s]" and told her to "get rid of" her accent in three months or she would be fired.  (Def's SUMF ¶¶ 45, 46); (Melendez Dep. 8:16–13:13).  Though Melendez says co-workers heard Sinni tell her to get rid of her accent, none of these co-workers corroborated Melendez's story and Sinni said she never threatened to fire Melendez.  (Def's SUMF ¶¶ 7, 39, 41–42); (Altare Decl. ¶ 5, ECF 18-17); (Williams Decl. ¶ 2, ECF 18-18); (Wu Decl. ¶ 2, ECF 18-19).  And uncertainty exists as to when Sinni allegedly said she would fire Melendez unless she got rid of her accent.  Melendez initially stated Sinni did so in February 2021, but in her deposition, said it was either a few days or a few weeks before she resigned.  (Am. Compl. ¶ 17, ECF 5); (Melendez Dep. 53:8–17, 139:14–140:19).

Either way, the record shows that Sinni felt Melendez performed her job commendably.  Her pay increased, Sinni pushed for her to receive a bonus she was initially ineligible to receive and she received a glowing six-month review.  (Sinni Decl. ¶ 13); (Def's SUMF ¶¶ 16, 72–73).  In a few review categories, Sinni scored Melendez higher than Melendez scored herself, particularly her communication skills, where Melendez rated them as "Needs Development" whereas Sinni rated them as "Approaching Skilled."  (Def's SUMF ¶¶ 17, 24).  Sinni also wrote "Yessina is a STAR!!"

and lauded her for "[e]xceptional teamwork." (*Id.* ¶ 18). Melendez indicated an interest in becoming a nurse, which on paper, Sinni supported. (Sinni Decl. ¶ 12); (Def's SUMF ¶ 23); (Performance Evaluation, at 10, ECF 18-12). Melendez contends that what Sinni wrote in her report is different than what she said. (Dec. 1, 2023 H'rg Tr. 49:10–13, ECF 23). She claims Sinni told her she would not become a nurse given her accent. (Melendez Dep. 13:5–15).

After her review, where Melendez claims Sinni told her she was "going nowhere," she cried in the lunchroom and says she had a panic attack. (Melendez Dep. 99:10–15). Melendez, a single-mother, believed Sinni was going to fire her, so she called a former colleague who helped her get a job offer at Everside Health in New Jersey. (Melendez Dep. 18:12–18). Soon thereafter, on September 13, 2021, Melendez emailed Sinni her resignation, opting for the position at Everside. (Def's SUMF ¶¶ 29–35). Her decision surprised Sinni, as Melendez had never been disciplined at work and Sinni thought she was happy and viewed her as a long-term employee. (Sinni Decl. ¶ 14). Moreover, Melendez never formally complained about any harassment despite knowing of Penn's comprehensive policies on Equal Employment Opportunity/Affirmative Action and Non-Discrimination. (Def's SUMF ¶¶ 14, 48); (Melendez Dep. 69:8–72:3). Melendez confirmed she reviewed the policies during her orientation at Penn, but says she heard two former employees were fired because they made complaints. (Melendez Dep. 69:8–72:3); (Pl. Resp. to Mot. Summ. J., at 3, ECF 19). Instead, Melendez said she shared her grievances with co-workers, including a "de-facto manager" named Yaneliz, though Yaneliz did not supervise Melendez or hold any official management position. (Pl. Resp. to Mot. Summ. J., at 3); (Dec. 1, 2023 H'rg Tr. 55:15–56:18).

Sinni met with Melendez after she emailed her resignation and tried to convince her to stay. (Def's SUMF ¶¶ 31–33); (Sinni Decl. ¶¶ 15–18). Melendez was not entirely opposed, but said she wanted a raise, something Penn was not willing to offer given the uncertainty of the Covid-19 pandemic. (Sinni Decl. ¶ 17). Moreover, she had bought a home in New Jersey and wanted to work in her home state. (*Id.* ¶ 18). Reluctantly, Sinni accepted Melendez's resignation on September 16, to be effective September 27— the same day she was to begin work with Everside. (Def's SUMF ¶ 35); (Everside Offer Letter, at 2, ECF 18-13).

In October of 2022, Melendez filed suit in the Philadelphia County Court of Common Pleas. (Notice of Removal, at 1, ECF 1). In February of 2023, she amended her complaint to add federal claims. (*Id.* at 2). Penn then removed the case to federal court. (*Id.*) Melendez asserted seven claims: race discrimination under Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866 and the Pennsylvania Human Relations Act; hostile work environment under Title VII, Section 1981 and the PHRA; and retaliation under Title VII. After discovery, Penn moved for summary judgment on all claims. (ECF 18). On December 1, 2023, the Court held oral argument, where Melendez's counsel agreed judgment should be entered on the retaliation claim. (Dec. 1, 2023 H'rg Tr. 2:17–3:9).

II

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). To defeat a motion for summary judgment, there must be a factual dispute

6

that is both material and genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

III

Discrimination claims under Title VII, Section 1981 and the PHRA are governed by the *McDonnell Douglas* burden shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981). Because Melendez's discrimination claims are analyzed under similar frameworks, the Court considers them together. *Rosencrans v. Quixote Enters.*, 755 F. App'x 139, 141 (3d Cir. 2018) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)). Melendez bears the initial burden of demonstrating a *prima facie* case of unlawful discrimination. To establish a *prima facie* case, Melendez must show: (1) she belongs to a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances surrounding the adverse employment action give rise to an inference of discrimination. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

A

Melendez, a Hispanic woman qualified for the position, cannot establish the *prima* facie case because (1) she did not suffer an adverse employment action, but rather resigned to take a job closer to her home, and (2) even if she did suffer an adverse employment action, there is no evidence in the record from which reasonable jurors could infer that Penn discriminated against her because of her race or ethnicity.

1

Resignation can constitute an adverse employment action where there was a constructive discharge, requiring the plaintiff to show that an employer permitted such

intolerable discriminatory employment conditions that a reasonable person would resign. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996). The test is objective; "subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013). A plaintiff cannot establish intolerability "by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign." *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) (quoting *Blistein v. St. John's College*, 74 F.3d 1459, 1468 (4th Cir. 1996)). Non-dispositive factors to consider include threats of discharge, demotion, reduction of benefits, alteration of job responsibilities and suggestions to resign. *Clowes v. Allegheny Valley Hospital*, 991 F.2d 1159, 1162 (3d Cir. 1993).

The record contradicts Melendez's allegations that she was subject to work conditions so intolerable that a reasonable person would be forced to resign. Though Melendez claims Sinni told her she would be fired in three months if she did not get rid of her accent, when Melendez submitted her resignation, Sinni asked her to stay at Penn, but Melendez chose to work closer to home. (Sinni Decl. ¶¶ 15–18). There is no record evidence Melendez was encouraged to resign, demoted, transferred to a less desirable job or had her responsibilities altered. Not only were her pay and benefits never reduced, she received a raise over the course her employment, and Sinni viewed her as a long-term employee and advocated for Melendez to receive a bonus she was initially ineligible for. (*Id.* ¶¶ 12–13). Melendez was never given an unsatisfactory job

9

performance review; to the contrary, her only review was glowing. Sinni called her a "STAR!!," lauded her for "exceptional teamwork" and noted she was "[s]aving lives." (Def's SUMF ¶ 18). Sinni scored Melendez higher than she scored herself overall and in categories like "work process and results achieved," "patient/customer/client experience," and communication skills. (Performance Evaluation, at 5–7).

Though Melendez claims Sinni was "mean," micromanaged her and made her "cry every day," (Melendez Dep. 8:16–25), (Am. Compl. ¶ 16), nothing in the record corroborates those, or any of her other, complaints. *See, e.g., Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) ("[U]nsupported deposition testimony, which is contradicted by the record, is insufficient to defeat summary judgment."). Even if Melendez pointed to anything that did, "an employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge." *Mandel*, 706 F.3d 169. And a "reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option." *Clowes*, 991 F.2d at 1162. Melendez never lodged a complaint about Sinni's alleged harassment or discrimination despite knowing, from her orientation, of Penn's non-discrimination policies and procedures. (Def's SUMF ¶¶ 14, 48); (Melendez Dep. 69:8–72:3). In short, no reasonable trier of fact could conclude her work environment was so intolerable that she was forced to resign.

2

i

Even if Melendez suffered an adverse employment action, there is no record evidence from which reasonable jurors could infer that her race or national origin had anything to do with her switching jobs. Even if Sinni complained about Melendez's accent, "there is nothing improper about an employer making an *honest* assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance." *Fragante v. Honolulu*, 888 F.2d 591, 599 (9th Cir. 1989) (emphasis in original); *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 487–88 (6th Cir. 2020) (recognizing a difference between discriminatory animus motivating accent-based comments directed at an employee and situations where the plaintiff's accent affects their ability to perform the job effectively, with the latter not being unlawful discrimination); *Park v. Sec. U.S. Dep't of Veterans Affairs*, 594 F. App'x 747, 749–50 (3d Cir 2014) ("A language barrier between co-workers may cause difficulties in the workplace, but . . . accounting for a language barrier does not amount to unlawful discrimination."); *Le v. City of Wilmington*, 736 F. Supp.2d 842, 855 (D. Del. 2010) ("[A]n employee's heavy accent or difficulty with spoken English can be a legitimate basis for adverse employment action where effective communication skills are reasonably related to job performance.'").

References to a plaintiff's accent and lack of command of English "simply cannot be attributed to racial bias, at least in the absence of any other evidence of racially discriminatory intent." *Mandalapu v. Temple University Hosp. Inc.*, No. 15-5977, 2018 WL 3328026, at *9 (E.D. Pa. July 5, 2018). In *Mandalapu*, the plaintiff, a physician

born in India, brought a race discrimination claim after he was not promoted and no longer allowed to continue in his residency program. *Id.* at *6. In evaluating the plaintiff for promotion, Temple considered, amongst other factors, his accent and difficulty with the English language. *Id.* at *9. Finding no inference of racial discrimination, the court noted that "a medical professional's ability to communicate effectively with both patients and colleagues is an important attribute." *Id.*

Similarly, effective communication with patients, co-workers and physicians was vital to Melendez's position. The job description—which Melendez agreed was accurate—required "interpersonal/verbal communication skills" and the "ability to speak, read, and, write in English." (Clinical Services Associate Job Description, at 3); (Melendez Dep. 73:6-19). From the outset of her employment, Penn received complaints of Melendez's communicative abilities. (Def's SUMF ¶¶ 12–13); (Sinni Decl. ¶ 6). Sinni's response, namely, coaching Melendez, reviewing her emails and accompanying her in patient meetings, was directly related to ensuring optimal patient care and preventing Melendez's accent from interfering with her responsibilities. There is no record evidence—none—that anything Sinni did involved discrimination against Melendez because of her race. Melendez was not mocked because of her accent—she was hired, in part, *because* of her Spanish-speaking abilities. Nor is there anything in the record showing Sinni targeted or discriminated against other Hispanic employees. To the contrary, Laleshka Feliz left Penn for two other positions and requested to return both times, and in one resignation letter, wrote positive feedback on her experience working with Sinni. (Sinni Decl. ¶ 4); (Def's SUMF ¶ 56). Though Melendez may not have enjoyed such close supervision, "courts have held a supervisor can

12

criticize and micromanage a subordinate and it will not be actionable absent discriminatory animus." *Lillie v. Chartwells*, No. 04-5453, 2007 WL 951900, at *8 (N.D. Ill. Mar. 26, 2007) (citing cases).

ii

Melendez relies solely on two things to support her racial discrimination claim: (1) a Facebook message between Melendez and a former co-worker, Stacey Williams; and (2) an unsworn letter from Kathy Soto, Melendez's supervisor at Everside. (Dec. 1, 2023 H'rg Tr. 30:6–31:11). Neither is record evidence the Court can consider, and even if they were part of the record, they contain nothing from which jurors could properly infer racial discrimination. Only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment. *See, e.g., Bender v. Norfolk Southern Corp.*, 994 F. Supp.2d 593, 600 (M.D. Pa. 2014). Melendez's counsel admitted that without the Facebook message and letter, the Court should enter judgment for Penn. (Dec. 1, 2023 H'rg Tr. 39:19–25).

Beginning with the Facebook message, Williams responded to Melendez's statement referencing "what Sinni tell me about my accent" by saying "Debbie is an ass" and "[t]hat's discrimination." (Pl. Resp. to Mot. Summ. J., at 15–17). As an initial matter, the statement is rank hearsay.[3] Fed. R. Evid. 802. In any event, Williams's

---

[3] Melendez's counsel admits as much but contends, incorrectly, the statement falls under the "present sense impression" exception to the hearsay rule. (Dec. 1, 2023 H'rg Tr. 31:12–19). This exception has three requirements: (1) the declarant must have personally perceived the event described; (2) the declaration must be an explanation or description of the event rather than a narration; and (3) the declaration and the event described must be contemporaneous. Fed. R. Evid. 803(1). Williams never saw or heard the event Melendez told her about. In fact, Williams denies hearing Sinni tell Melendez she would be fired if she did not get rid of her accent, (Williams Decl. ¶ 2), and her comment in a Facebook message made over a month after Melendez resigned is not a present sense impression.

comment that "Debbie is an ass" provides no nexus to race or national origin discrimination. And even if Williams testified at trial, her purported legal opinion that whatever Sinni did was "discrimination" would be inadmissible. Under Federal Rule of Evidence 701, opinion testimony by lay witnesses is permissible if it is (1) rationally based on the witness's perception; (2) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (3) not based on scientific, technical or other specialized knowledge within the scope of Rule 702. Fed. R. Evid. 701. Williams's opinion would not be helpful within the meaning of Rule 701 because it is the jury's job to decide, based on all of the evidence, if Sinni discriminated against Melendez based on her race. *See Hester v. BIC Corp.*, 225 F.3d 178, 182, 184 (2d Cir. 2000) (finding inadmissible testimony by four witnesses who were not involved in decision-making process that employment decision "must have been" based on race); *McNulty v. Citadel Broad. Co.*, 58 F. App'x 556, 564 (3d Cir. 2003) (citing *Hester* with approval).

Next, Melendez banks on an unsworn letter, ostensibly from her supervisor at Everside, Kathy Soto, who said Melendez had "difficulties connecting with patients due to her insecurities of speaking English out loud" and told her about "the discrimination of her accent with her last employer." (Pl. Resp. to Mot. Summ. J., at 25). Addressed "To Whom It May Concern," the Soto letter was not signed under penalty of perjury and cannot create a genuine issue of material fact.[4] *Doe v. Heart Sol., PC*, 923 F.3d 308,

---

[4] And again, the letter is hearsay and is not, as counsel claimed, a "present sense impression." (Dec. 1, 2023 H'rg Tr. 37:15–19). Soto did not observe or hear Sinni make the alleged comments to Melendez. And even if Soto testified at trial, the observation that Melendez had "insecurities of speaking English out loud" does not provide a nexus to any intentional race-based discrimination, and the statement that Melendez faced "discrimination of her accent with her last employer" is another impermissible instance of a lay witness testifying as to the ultimate issue of the case. *See Hester*, 225 F.3d at 182, 184; *Connearney v. Main Line Hospitals, Inc.,* No. 15-2730, 2016 WL 6569326, at *3–4 (E.D. Pa. Nov. 4, 2016).

315 (3d Cir. 2019) ("While an unsworn statement may be considered on summary judgment, an unsworn statement that has not been made under penalty of perjury cannot."). On this record, Melendez cannot establish a *prima facie* case of discrimination under Title VII, Section 1981 and the PHRA.

IV

To succeed on a hostile work environment claim under Title VII, Section 1981 and the PHRA, a plaintiff must show that: (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) respondeat superior liability exists. *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017); *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001). Courts consider the totality of the circumstances when deciding whether harassment was sufficiently severe or pervasive to create a hostile work environment, *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993), and look to the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (internal quotation marks and citations omitted). Offhand comments and isolated incidents, unless extremely serious, do not amount to discriminatory changes in the terms and conditions of employment. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 271 (2001).

Melendez's hostile work environment claims fail because there is no record evidence to show she was subjected to severe or pervasive discriminatory conduct based

on her race or national origin.  As discussed *supra* subsection III.A.2.i, Sinni's comments pertained to Melendez's ability to perform material aspects of her job, namely, communicate effectively with patients, co-workers and physicians, and there is nothing improper about an employer making an honest assessment of oral communication skills when such skills are reasonably related to job performance.  *See Fragante*, 888 F.2d at 599.  Melendez "needs more than rank speculation" that Sinni discriminated against her, and she cannot defeat summary judgment based on unsupported assertions, conclusory allegations or mere suspicions.  *Hunter v. Trustees of University of Pennsylvania*, No. 20-2334, 2021 WL 1424710, at *8 (E.D. Pa. Apr. 15, 2021) (citing *Schaar v. Lehigh Valley Health Servs., Inc.,* 732 F. Supp.2d 490, 493 (E.D. Pa. 2010)).

    An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.